**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| BRENDA LEATHERS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 2:19-cv-04939-JMG |
| | : | |
| GLAXOSMITHKLINE, LLC., | : | |
| Defendant. | : | |

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **May 7, 2021**

## I.    OVERVIEW

Under the terms of the Family and Medical Leave Act (FMLA), eligible employees are entitled to up to twelve weeks of leave due to, among other things, a serious underlying health condition rendering them unable to perform the functions of their job. Accordingly, the FMLA prohibits employers from interfering with an employee's rights under the statute, or from discriminating or retaliating against the employee based on their exercise of those rights. Plaintiff Brenda Leathers alleges that her former employer interfered with her FMLA rights by failing to restore her to the same, or similar, position upon the conclusion of her protected leave. Additionally, Plaintiff contends that she was subject to discrimination and retaliation due to her need for a medical accommodation. Presently before the Court is Defendant's Motion for Summary Judgment, seeking dismissal of this action based on Plaintiff's purported inability to offer sufficient factual support for her claims. For the reasons set forth below, the Court finds that there is no genuine dispute that Defendant had no duty restore Plaintiff to the same or similar

position following her leave of absence, or that she was terminated for legitimate, non-discriminatory reasons.  Therefore, Defendant's Motion for Summary Judgment is granted.

## II.    FACTUAL BACKGROUND

### a.  Allegations

Plaintiff Brenda Leathers worked as a Biopharmaceutical Manufacturing Associate ("BMA") at Defendant GlaxoSmithKline's ("GSK") Upper Merion, Pennsylvania facility from February 2006 until June 2018.  *See* Compl. ¶¶ 12, 26 (ECF No. 13); Defendant's Statement of Undisputed Facts ("DSUF") ¶ 4.  GSK maintained an FMLA policy under which eligible employees could take up to twelve weeks of protected leave and six months of concurrent short-term disability ("STD") leave.  DSUF ¶ 1.  On or about December 11, 2017, Plaintiff requested FMLA leave in order to treat a qualifying medical condition which included psychological distress, emotional trauma, depression, and anxiety following the death of her mother.  Compl. ¶ 13.  GSK designated Carolyn Harriss as Plaintiff's Nurse Case Manager to help facilitate Plaintiff's leave of absence.  DSUF ¶ 11. On December 14, 2017, Ms. Harriss provided Plaintiff with the requisite paperwork and information concerning the company's FMLA and STD policies.  *Id.* ¶ 12.  Ms. Harriss also informed Plaintiff that, absent notice to the contrary, her leave request was approved. *Id.*

On December 20, 2017, in accordance with GSK policies, Plaintiff submitted her FMLA Certification for Self or Family.  *Id.* ¶ 15.  According to the Certification, Dr. Shahnawaz Khan determined that Plaintiff was unable to work due to her depression.  *Id.*  Plaintiff subsequently sent GSK a second Certification from her psychologist, Dr. Samuel Milioti, stating that Plaintiff would not be able to effectively perform her job functions.  *Id.* ¶ 16.  On January 26, 2018, Plaintiff informed Ms. Harriss that she had been diagnosed with lupus.  *Id.* ¶ 17.  Approximately one month

later, on February 28, 2018, Plaintiff provided Ms. Harris notes from her pulmonologist, Dr. Sandeep Chennadi, and her rheumatologist, Dr. Eric Russell, stating that Plaintiff could "return to work immediately with no restriction except to avoid exposure to chemicals."[1] *Id.* ¶¶ 18-19.

After receiving these notes, Ms. Harriss sent a fax containing information about Plaintiff's position to Dr. Russell on March 12, 2018. *Id.* ¶ 20. Ms. Harriss inquired as to what specific accommodations would allow Plaintiff to return to work. *Id.* The Head of Employee Health and Wellbeing at GSK, Dr. David Siebens, also attempted to contact Dr. Russell, but received no reply. *Id.* ¶ 21. Dr. Siebens then sent a letter to Dr. Chennadi on March 23, 2018, asking for additional information concerning the specific chemicals or work environment that Plaintiff should avoid. *Id.* ¶ 25. Dr. Chennadi never replied to Dr. Sieben's letter. *Id.*

On March 12, 2018, Ms. Harriss emailed Plaintiff to inform her that GSK was in the process of reviewing her request for an accommodation. *Id.* ¶ 22. GSK then sent a letter to Plaintiff on March 16, 2018, reminding her that her STD benefits would end on June 11, 2018. *Id.* ¶ 23. On April 6, 2018, Ms. Harriss emailed Plaintiff to inform her that GSK was continuing their review of her accommodation request and to introduce her to Michele Mulkern, GSK's Director of HR Shared Services for Global Manufacturing and Supply. *Id.* ¶ 26. Ms. Mulkern discussed alternative job opportunities with Plaintiff and asked for a copy of her resume. *Id.* ¶ 27. GSK Human Resources Manager Gene Carroll subsequently contacted Plaintiff to inform her that he had searched for alternative roles for Plaintiff in other departments, but had yet to identify a vacant position for which she was qualified. *Id.* ¶ 29.

On May 2, 2018, Mr. Carroll sent Plaintiff a letter stating that GSK was still unable to determine what adjustments to her current role would satisfy her chemical exposure restriction

---

[1] GSK required certification from Plaintiff's health care providers concerning the medical accommodations necessary for Plaintiff to return to work. *See* Harriss Dep., Appx. 00359:9-00360:8.

while also enabling her to perform the essential functions of her job. *Id.* ¶ 30. Mr. Carroll further stated that although they still had not found a new job for Plaintiff, GSK would continue reviewing potential opportunities in other areas of the Upper Merion plant and at nearby GSK sites. *Id.* Finally, Mr. Carroll informed Plaintiff that during this ongoing process, Plaintiff would remain on STD leave, which expired on June 11, 2018. *Id.* Approximately one week later, Mr. Carroll notified Plaintiff of an open Administrative Assistant position at the GSK facility in Collegeville, Pennsylvania. *Id.* ¶ 33. Plaintiff declined to apply for this position, stating that the additional twenty-minute commute would have been too long. *Id.* ¶ 34; Plaintiff's Statement of Disputed Facts ("PSDF") ¶ 34. Mr. Carroll encouraged Plaintiff to continue searching for other positions. *Id.* ¶ 35.

GSK terminated Plaintiff on June 11, 2018 following the expiration of her STD leave. *Id.* ¶¶ 39-40. Plaintiff thereafter brought suit in the underlying action based on GSK's purported failure to comply with the FMLA. Specifically, Plaintiff alleges that GSK interfered with her rights by declining to authorize her FMLA leave and failing to restore her to the same or equivalent position. Compl. ¶¶ 30, 50(g). Plaintiff also contends that GSK retaliated and discriminated against her by refusing to accommodate her medical restriction and making insufficient efforts to find her an alternative position. DSUF ¶ 43.

### b. Procedural History

Plaintiff filed a Complaint in this matter on October 18, 2019. (ECF No. 1). On December 18, 2019, Defendant filed an Answer to the Complaint. (ECF No. 5). Plaintiff then filed an Amended Complaint on February 7, 2020, which Defendant answered on February 21, 2020.[2] (ECF No. 14). Defendant filed a Motion for Summary Judgment on December 14, 2020. (ECF

---

[2] This case was reassigned from Judge Curtis Joyner to this Court on March 3, 2020. (ECF No. 15).

No. 36).  Plaintiff filed a Response to Defendant's Motion on January 5, 2021.  (ECF No. 40).  On

January 11, 2021, Defendant filed a Reply to Plaintiff's Response.  (ECF No. 41).

## III.    LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A factual dispute is "genuine" when the "evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Physicians Healthsource, Inc. v. Cephalon,*

*Inc.*, 954 F.3d 615, 618 (3d Cir. 2020).  Likewise, a factual dispute is material if "it might affect

the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  In applying this standard, the court must "construe the evidence in the light most

favorable to the non-moving party."  *Id.* at 255.  However, the court must grant summary

judgment where the non-moving party fails to "establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  In other words, the court must examine "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

## IV.    ANALYSIS

### a.  FMLA Interference

Plaintiff argues that Defendant interfered with her FMLA rights by failing to restore her to

her role as BMA, or to an equivalent position, upon her return from STD leave.  Pl. Resp. 6.

According to Plaintiff, GSK had a duty to reinstate her because they had not otherwise determined

that Plaintiff could not perform the essential functions of her job.  *Id.*  Likewise, Plaintiff reasons

that Defendant prevented her from returning to work, despite her ability and desire to do so, thereby

exhausting her FMLA and STD leave against her wishes. *Id.* at 7. Plaintiff contends that because she has alleged facts sufficient to raise a genuine issue of material fact concerning her interference claim, Defendant's Motion should be denied.

Defendant counters that there is no record evidence suggesting that GSK interfered with Plaintiff's rights under the FMLA. Def. Mot. 8. In fact, Defendant argues that the undisputed facts support the opposite conclusion. *Id.* Defendant states that GSK approved Plaintiff's leave request almost immediately, provided her with all appropriate forms under the FMLA, and allowed to her complete twelve months of FMLA and six months of concurrent STD leave. *Id.* Additionally, Defendant emphasizes that Plaintiff's BMA position remained available to her in anticipation of her return. *Id.* at 8-9. Defendant alleges that Plaintiff was not restored to her BMA role because her chemical restriction prevented her from performing an essential function of her job. *Id.* at 9-10. As a result, Defendant argues that GSK had no duty to restore Plaintiff to the same or similar position, and is therefore entitled to judgment as a matter of law. *Id.* at 10.

The FMLA provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the statute. 29 U.S.C. § 2615(a)(1). An employer who violates this provision may be subject to civil penalties including compensatory damages for any lost wages, salary, employment benefits, or other compensation, in addition to liquidated damages. *Id.* §2617(a)(1). To assert an interference claim, the employee need only show that (1) they were entitled to benefits under the FMLA and (2) that those benefits were denied.[3] *Beese v. Meridian Health Systems, Inc.*, 629 Fed. App'x 218, 223 (3d Cir. 2015). These benefits include an employee's right "to be restored by the employer to the position of

---

[3] An interference action is unrelated to claims regarding discrimination, thereby only requiring an inquiry into whether the employer provided benefits guaranteed under the FMLA to the employee. *Callison v. City of Philadelphia*, 430 F.3d 117, 120 (3d Cir. 2005).

employment held by the employee [or an equivalent position] when the leave commenced" at the conclusion of their FMLA leave. 29 U.S.C. § 2614(a)(1).

An employer's failure to restore an employee to the same or equivalent position upon their return from leave is not a violation of the FMLA if the employee is unable to perform an essential function of that position due to a physical or mental health condition. 29 C.F.R. § 825.216(c). An essential function is any fundamental job duty, as evidenced by factors including the employer's judgment as to which functions are essential, written job descriptions, the amount of time spent performing the function, the consequences of not requiring the employee to perform the function, and the work experience of past incumbents in the same position.[4] *Id.* § 1630.2(n). FMLA regulations "place the onus on an employee's health care provider, not their employer, to certify whether the employee is unable to perform any essential function of their job." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 254 (3d Cir. 2014) (citing 29 C.F.R. § 825.123(a)). The FMLA also does not require employers "to provide a reasonable accommodation to an employee to facilitate [their] return to the same or equivalent position."[5] *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 271 (3d Cir. 2012). Accordingly, an employer has no duty to reinstate an employee to the same or equivalent position absent certification from the employee's healthcare provider that they can return to work without restriction on their essential job duties.[6] *See Budhun*, 765 F.3d at 254 n.4.

---

[4] Whether a specific job duty is an essential function is a question of fact that must be determined on a case-by-case basis. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006). Accordingly, the FMLA incorporates guidelines from the Americans with Disabilities Act (ADA), which provide a non-exhaustive list of evidence to consider in determining whether a job duty is essential. *See* 29 C.F.R. § 825.123(a).

[5] The employer may have obligations under the Americans with Disabilities Act. 29 C.F.R. § 825.16(c). However, Plaintiff has raised no ADA claims in this case.

[6] To succeed on an FMLA interference claim, the plaintiff must establish that they were not returned to an equivalent position despite being able to perform the essential functions of that position. *See Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002). The burden is on the employee to demonstrate that they can perform the essential functions of their job upon their return from FMLA leave. *Baker v. Hunter Douglas Inc.*, 270 Fed. App'x 159, 162 (3d Cir. 2008).

The purpose of the BMA position is to "perform[] production operations including fermentation or cell culture operations, preparation of media and buffer solutions, chromatic separation, filtration and concentration operations" and assistance with "start-up and product changeover activities." *See* BMA Job Description, Appx. 01261. Accordingly, one of the key responsibilities of a BMA is "[c]ompleting daily manufacturing tasks per standard operating procedures and batch document instructions." *Id.* Ms. Leathers and GSK personnel agree that these duties require frequent exposure to a variety of chemicals. Pl. Dep., Appx. 00101:18-00103:23;[7] Carroll Dep., Appx. 00582:20-00583:21;[8] Wiand-Stanton Dep., Appx. 00779:17-

---

[7] The Court acknowledges Plaintiff's allegation that "whether Plaintiff was unable to perform the essential function[s] of the BMA position is clearly disputed." Pl. Resp. 6-7. However, Plaintiff offers no factual support for this contention. Plaintiff argues that the absence of a formal determination from GSK concerning Plaintiff's ability to perform the essential functions of her job creates a factual dispute. But the "onus [is] on an employee's health care provider, not their employer, to certify whether the employee is unable to perform any essential function of their job." *Budhun*, 765 F.3d at 254 (citing 29 C.F.R. § 825.123(a)). Despite GSK's multiple requests for clarification, Plaintiff's health care providers never identified the specific job duties that Plaintiff was unable to perform in accordance with their recommendations that she avoid exposure to chemicals. *See infra* pp. 10-11. For example, GSK sent Dr. Russell a job description for the BMA position asking what accommodations would allow Plaintiff to return to work. *See* Harriss Fax to Dr. Russell, Appx. 01136. Dr. Siebens also attempted to contact Dr. Russell and sent a letter to Dr. Chennadi seeking to clarify Plaintiff's specific restrictions. Siebens Decl., Appx. 1063. GSK asserts that they never received a response from Plaintiff's providers, and the record contains none. Plaintiff attempts to counter these facts by asserting that "[i]t is not known" whether Plaintiff's providers received these messages from GSK. PSDF ¶ 21. This is insufficient to raise a genuine factual dispute. "The common law has long recognized a presumption that an item properly mailed was received by the addressee." *In re Cendant Corp. Prides Litigation*, 311 F.3d 298, 304 (3d Cir. 2002). Plaintiffs do not dispute that Ms. Harriss's fax or Dr. Sieben's letter were properly addressed. Additionally, it is unclear how Plaintiff's attempt to prove a negative through the absence of fact creates a "sufficient evidentiary basis upon which a reasonable factfinder could find for the non-moving party" or generate a "factual issue[] that must be tried." *Anderson*, 477 U.S. at 247-49. Instead, Plaintiff "must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings." *Szostek v. Drexel Univeristy*, No. 12-2921, 2013 WL 4857989, at *6 (E.D. Pa. Sept. 11, 2013) (citing *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007)). Plaintiff's argument falls well short of this standard.

[8] Mr. Carroll testified that mixing chemicals with other combinations of chemicals "was an essential part of the job." *See* Carroll Dep., Appx. 00582:20-00583:21.

00783:14.[9]  In describing her job duties, Plaintiff explained that she most recently worked in chromatography purification, which involved chemical mixing and processing.  *See* Pl. Dep., Appx. 00102:10-00102:23.  Plaintiff estimates that approximately seventy five percent of her time as a BMA was devoted to "equipment setup, cleaning, [and] sterilization."  *See* Liberty Mutual Insurance Physical Job Evaluation Form, Appx. 01392.  Unsurprisingly, these cleanup and sterilization procedures require frequent exposure to various cleaning chemicals.  *See* Wiand Stanton Dep., Appx. 00782:6-00782:21.  When asked whether she could have worked a certain shift that would not have exposed her to any chemicals, Plaintiff replied that "it would be unpredictable to say which shift would have the most exposure at which particular time."[10]  Pl. Dep. 00244:25-00245:11.

When applied to the factors set forth in 29 C.F.R. § 1630.2(n), the undisputed facts weigh heavily towards a finding that exposure to chemicals was an essential function of the BMA position.  GSK personnel repeatedly described working with chemicals as a key function of the job.  The BMA job description confirms this by identifying the purpose and primary duties of the position as, among other things, chromatography, preparation of buffer solutions, and equipment sterilization.  These job duties all require frequent exposure to various chemical compounds.

---

[9] In describing the essential job duties of BMAs, Production Manager Nicole Wiand-Stanton stated that, "They were to ensure that the process was documented, equipment was cleaned and set up ready to go, they were responsible for running the process and maintaining our monthly compliance whether it was our safety walk-throughs, cleaning the equipment."  Wiand-Stanton Dep., Appx. 00779:21-00780:4.  Ms. Wiand-Stanton then explained that, at all times, BMAs are on the production floor, where "[t]he purification area…has all the operations with exception of final fill…so there's equipment, there's columns, there's all different kinds of buffers and solutions, cleaning chemicals that are all set up to run this purification process."  *Id.* at 00782:6-00782:21.  When asked whether there is any part of the BMA position which does not require exposure to chemicals, Ms. Wiand-Stanton replied, "No."  *Id.* at 00783:12-00783:14.  She explained that the buffer solutions are "made up of multiple different powders, chemical powders, liquid titrants."  *Id.* at 00785:15-00785:17.  Ms. Wiand-Stanton then noted that during each phase of chromatography, "you have to wash your column, all those buffers are going to have to have a different set of chemicals that go into them to change the condition of the columns so your protein can either bind or not bind depending on the actual science that we're trying to use to purify out for each step, so it's triggered by different PHs, different salts, different titrants for each of the steps."  *Id.* at 00785:17-00786:2.

[10] Plaintiff further stated that she could not have been assigned to different shifts as a BMA to avoid chemical exposure "[b]ecause all of the shifts perform the same functions."  Pl. Dep., Appx. 00242:13-00242:20.

9

Plaintiff herself estimates that three quarters of her job responsibilities require the use of cleaning chemicals. Not requiring Plaintiff to interact with any chemicals whatsoever would mean that Plaintiff could not be on the production floor or perform any of the primary duties of the position. Therefore, the Court finds that frequent exposure to, and handling of, a variety of chemicals was an essential function of Plaintiff's job.

On January 26, 2018, Plaintiff informed Ms. Harriss that she had been diagnosed with lupus. DSUF ¶ 17. Plaintiff subsequently sent two notes from Dr. Russell and Dr. Chennadi stating that, while she could return to work, they strongly recommended that she avoid exposure to chemicals. *Id.* ¶ 19. On March 12, 2018, Ms. Harriss sought clarification from Dr. Russell concerning his recommendation.[11] *Id.* ¶ 20; *see also* Harriss Email to Dr. Russell, Appx. 01136. Dr. Siebens also contacted Dr. Russell to follow up on Ms. Harriss's inquiry, but Dr. Siebens did not receive a reply. DSUF ¶ 21. On March 23, 2018, Dr. Siebens sent a letter to Dr. Chennadi asking for clarification regarding Plaintiff's chemical restrictions, but again received no response. *See* Siebens Decl., Appx. 01066. Ms. Harriss's notes indicate that she then urged Plaintiff, on at least two separate occasions, to follow up with her health care providers to clarify what accommodations were necessary for her to return to work. *See* Harriss Case Progress Notes, Appx. 01142-01143.

Plaintiff offers no evidence that her providers ever responded to GSK's request for clarification, and GSK asserts that no responses were ever received. DSUF ¶¶ 21, 25. The only recommendation on the record concerning Plaintiff's ability to perform her essential job functions

---

[11] Ms. Harriss faxed Dr. Russell a copy of the BMA job description and asked what specific accommodations Plaintiff required in order to "enable [Ms. Leather's] safe, timely, and productive return to work." *See* Harriss Fax to Dr. Russell, Appx. 01136. In requiring certification from a health care provider, employers have the option "to provide a statement of the essential functions of the employee's position for the health care provider to review. A sufficient medical certification must specify what functions of the employee's position the employee is unable to perform so that the employer can then determine whether the employee is unable to perform one or more essential functions of the employee's position." 29 C.F.R. § 825.123(b).

came from Dr. Milioti's FMLA Certification on January 15, 2018. In his Certification, Dr. Milioti "strongly recommended that [Ms. Leathers] be reassigned to another department" and that her current position "has resulted in her experiencing significant pulmonary problems and has compromised her immune system functioning" which exacerbates her depression. *See* Dr. Milioti FMLA Certification, Appx. 01123. Aside from Dr. Milioti's Certification, along with the instructions from Dr. Russell and Dr. Chennadi strongly recommending that she avoid exposure to chemicals, the only other information GSK had in determining how to safely return Plaintiff to work came from Plaintiff's own representations.

According to Ms. Harriss, Plaintiff consistently stated that she could only return to work if she could avoid exposure to chemicals.[12] *See* Harriss Dep., Appx. 00385:22-00386:12; Harriss Case Progress Notes, Appx. 01142-01146. Communications with Plaintiff confirm that GSK believed that she could not work with or be in the proximity of any chemicals. *See, e.g.*, Carroll Letter to Leathers, Appx. 01046. Since her termination, Plaintiff herself has repeatedly asserted that she could not have returned to her previous position without avoiding chemical exposure. *See* Pl. Dep., Appx. 00098:6-00098:23, 00108:24-00109:17, 00241:14-00242:1.[13] These affirmative representations suggest that Plaintiff's medical restriction required that she not be exposed to, or handle, any chemicals. This conclusion is further underscored by the fact that Plaintiff's medical providers provided no clear certification as to how she could safely return to work in light of her

---

[12] The Progress Notes indicate that on January 3, 2018, Plaintiff stated that she has an allergic reaction and trouble breathing when she gets near many areas, including outside of her usual workplace. Harriss Progress Notes, Appx. 01144-01145. During her deposition, Ms. Harriss stated that Plaintiff told her that she would "sometimes get outside her building and get very faintish, get very lightheaded before she even entered the building. So there was no way of knowing which of the many chemicals to avoid." Harriss Dep., Appx. 00386:7-00386:12, 00403:15-404:22.
[13] When asked whether it was fair to say that the only way she could have returned to her role as a BMA in 2018 was if she was provided an accommodation ensuring that she would not be exposed to chemicals, Plaintiff replied, "Yes." Pl. Dep., Appx. 00109:6-00109:17.

need to avoid chemical exposure. Accordingly, the Court finds no genuine dispute that Plaintiff's medical restriction rendered her unable to perform the essential functions of her job.

The essential functions of the BMA position necessitate frequent exposure to, and handling of, a variety of chemicals. Plaintiff's health care providers notified GSK that Plaintiff should avoid chemical exposure due to her underlying medical condition. GSK repeatedly sought clarification regarding which chemicals Plaintiff needed to avoid in order to facilitate her return to work.[14] Although Plaintiff's health care providers did not respond to GKS's requests for clarification, Plaintiff herself consistently acknowledged that she could not return to her previous position because of a medical accommodation requiring her to avoid exposure to chemicals. Since Plaintiff was unable to perform an essential function of her job, Defendant had no duty to restore her to the same or equivalent position under the FMLA.

Plaintiff has offered no evidence demonstrating that Defendant otherwise interfered with the exercise of her FMLA rights. GSK granted Plaintiff twelve weeks of FMLA leave and six months of concurrent STD leave through June 11, 2018. DSUF ¶¶ 13-14. Additionally, GSK provided Plaintiff with all necessary paperwork and notifications about her FMLA leave.[15] Pl. Dep., Appx. 1150:3-00150:12. Plaintiff's BMA position remained open during the entire duration of her FMLA and STD leave and GSK personnel located an alternative position for Plaintiff to

---

[14] The certifications provided by Plaintiff's medical providers did not provide GSK with adequate information to decide whether Plaintiff could return to her position as BMA. *See* 29 C.F.R. § 825.123(b) ("A sufficient medical certification must specify what functions of the employee's position the employee is unable to perform so that the employer can then determine whether the employee is unable to perform one or more essential functions of the employee's position.").

[15] Plaintiff explicitly acknowledged that Defendant allowed her to take FMLA leave and provided her with all necessary paperwork. Pl. Dep. 00150:3-00151:11. Furthermore, when asked by Defense counsel whether GSK precluded or interfered with her ability to take FMLA leave, Plaintiff responded, "No." Pl. Dep., Appx. 00094:10-00094:17. Later in her deposition, Plaintiff's counsel asked Plaintiff a series of questions concerning her testimony provided to Defense counsel. After asking Plaintiff whether she mistakenly testified that GSK did not retaliate against her, Plaintiff's counsel asked if Plaintiff believed that GSK attempted to interfere with her unemployment benefits as retaliation for having exercised her rights under the FMLA, to which Plaintiff replied, "Yes." Pl. Dep. 00250:16-00252:1.

consider. DSUF ¶¶ 33, 37. Having declined to apply for long-term disability ("LTD") or the alternative positions proposed by GSK, Plaintiff's leave ended on June 11, 2018 and Plaintiff was terminated.[16] *See id.* ¶¶ 34, 39-40; Pl. Dep., Appx. 00175:13-00176:7. Given these undisputed facts, the Court finds that Defendant is entitled to judgment as a matter of law on Plaintiff's interference claim.[17]

### b. FMLA Discrimination and Retaliation

Plaintiff alleges that Defendant also discriminated and retaliated against her because she exercised her rights under the FMLA. Pl. Resp. 7. In support of this contention, Plaintiff asserts that Defendant failed to make sufficient efforts to restore her to her position as BMA upon learning that she had a medical restriction. *Id.* at 8. Plaintiff contends that Defendant made no attempt to accommodate this restriction, either by allowing her to return to work with the use of a respirator or further extending her period of leave. *Id.* at 8, 13. Additionally, Plaintiff argues that Defendant intentionally exhausted her remaining FMLA and STD leave by engaging in a "prolonged determination of whether they could accommodate [her] restriction" as well as a "prolonged search for other comparable positions." *Id.* Plaintiff also claims that GSK personnel exhibited persistent antagonism and a change in demeanor towards her, stating that "it is entirely plausible that Defendant lost patience with Plaintiff's third FMLA leave request during her employment." *Id.*

In response, Defendant asserts that Plaintiff cannot demonstrate that her termination was causally connected to the exercise of her FMLA rights. Pl. Mot. 12. Defendant argues that Plaintiff cannot sustain her burden of establishing the requisite temporal proximity or antagonistic conduct necessary to raise an inference of discrimination or retaliation. *Id.* at 12-13. Likewise,

---

[16] FMLA protections are limited to the statutorily prescribed period of leave. *Frederick v. Brandywine Hosp., Inc.*, No. 03-3362, 2003 WL 21961372, at *1 (E.D. Pa. July 7, 2003).

[17] "[F]or an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." *Ross v. Gilhuly*, 755 F.3d 185, 192 (3d Cir. 2014).

Defendant alleges that Plaintiff cannot establish that GSK's purported reason for terminating her was pretextual. *Id.* at 14. Having failed to offer factual support for her allegations of discrimination and retaliatory animus, Defendant maintains that there is no genuine dispute that Plaintiff was terminated for legitimate, non-discriminatory reasons. *Id.* at 15-17.

FMLA regulations prohibit employers from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). To succeed on a discrimination or retaliation claim,[18] the plaintiff must demonstrate that (1) they invoked their right to FMLA leave; (2) they suffered an adverse employment action; and (3) the adverse action was causally related to their invocation of FMLA rights. *Banner v. Fletcher*, 834 Fed. App'x 766, 770 (3d Cir. 2020). Courts in the Third Circuit analyze these claims under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2014). Therefore, if the plaintiff establishes a *prima facie* case of retaliation or discrimination, the burden of production shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer meets this minimal burden, the plaintiff must then prove, by a preponderance of the evidence, that the employer's proffered reason was pretextual. *Id.*

To establish a *prima facie* case of causation between an employee's invocation of their FMLA rights and an adverse employment action, a plaintiff must show "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing." *Budhun*, 765 F.3d at 258 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). Where temporal proximity is

---

[18] FMLA discrimination and retaliation claims are both analyzed under the same framework. *Silver v. Philadelphia Gas Works*, No. 11-7898, 2012 WL 5961756, at *5 (E.D. Pa. Nov. 28, 2012).

found to be unduly suggestive, this alone is sufficient to create an inference of causation. *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). However, when the court finds that temporal proximity is not unduly suggestive, it must then determine whether the proffered evidence, taken as a whole, suffices to raise such an inference. *Lichtenstein*, 691 F.3d at 307. At that time, the court may consider such additional evidence as acts of intervening antagonism, inconsistencies in the employer's articulated reasons for termination, or other evidence supporting an inference of retaliatory animus. *LeBoon*, 503 F.3d at 232-33.

The Court finds that Plaintiff has failed to meet her burden under the *McDonnell Douglas* framework. As an initial matter, Plaintiff has not established a *prima facie* case of causation. Plaintiff requested FMLA leave on or about December 11, 2017. Compl. ¶ 13. On December 14, 2017, Ms. Harriss informed Plaintiff that her FMLA leave was approved. DSUF ¶ 12. Plaintiff submitted her FMLA Certification on December 20, 2017. *Id.* ¶ 15. On February 28, 2018, Plaintiff faxed two Return to Work Letters to Ms. Harriss from Dr. Russell and Dr. Chennadi advising GSK that Plaintiff could "return to work immediately with no restriction except to avoid exposure to chemicals." *Id.* ¶ 19. Plaintiff was ultimately terminated upon the expiration of her STD leave on June 11, 2018. *Id.* ¶¶ 39-40.

The relevant dates for assessing temporal proximity are those on which the employee invoked their rights under the FMLA and the date of the adverse action. *See Budhun*, 765 F.3d at 256. While neither Party contests that Plaintiff's termination was the relevant adverse action for the purposes of this analysis, they disagree as to when Plaintiff last invoked her FMLA rights. Defendant asserts that Plaintiff last exercised her FMLA rights on December 6, 2017 when she first requested FMLA leave. Def. Mot. 12-13. Plaintiff counters that the Court should analyze temporal proximity from February 28, 2018, when Plaintiff attempted to return to work, and from

mid-April 2018, when she told Mr. Carroll that she felt that she was being treated unfairly. Pl. Resp. 10. These arguments notwithstanding, the Court need not definitively state which of these actions constituted Plaintiff's last protected activity because none of them occurred within an unduly suggestive timeframe.

While there is no bright line rule as to what constitutes unduly suggestive temporal proximity, courts have routinely granted summary judgment in cases where several weeks or months have elapsed between an employee's invocation of FMLA rights and the adverse employment action. *See, e.g.*, *Duncan v. Chester County Hospital*, 677 Fed. App'x 58, 62 (3d Cir. 2017) (thirty-four days not unduly suggestive); *LeBoon*, 503 F.3d at 233 ("a gap of three months…without more, cannot create an inference of causation and defeat summary judgment"); *Blakney v. City of Philadelphia*, 559 Fed. App'x 183, 186 (3d Cir. 2014) ("a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive"); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (three weeks insufficient to raise an inference of causation). In the instant case, Plaintiff last invoked her FMLA rights, at a minimum, two months prior to her termination. This is facially insufficient to establish unduly suggestive temporal proximity. Therefore, the Court must consider whether additional evidence demonstrates a pattern of antagonism, inconsistencies in the employer's articulated reasons for termination, or other evidence giving rise to an inference of causation.

A pattern of antagonism exists "where an employee is subject to a constant barrage of written and verbal warnings" or "to repeated violations for trivial matters and unusually close supervision" following the exercise of their FMLA rights. *See Wells v. Retinovitreous Assocs.*, No. 15-5675, 2016 WL 3405457, at *3 (E.D. Pa. June 21, 2016) (internal citations omitted). Plaintiff contends that "Ms. Harriss engaged in a period of antagonism and change in demeanor

upon receiving notice of Plaintiff's lupus diagnosis and restriction in late January 2018 up and until her termination on June 11, 2018." Pl. Resp. 10. In support of these allegations, Plaintiff asserts that when she initially told Ms. Harriss that she had been diagnosed with lupus and that she had work restrictions, Ms. Harriss purportedly said "oh, were you planning on retiring?" Pl. Dep., Appx. 00258:18-00258:25. Additionally, Plaintiff states that, to her recollection, Ms. Harriss "mention[ed] something about retirement" on one other occasion.[19] *Id.* 00259:12-00259:18. As further evidence of her antagonism, Plaintiff alleges that Ms. Harriss asked her on several occasions whether she had considered taking LTD, stated that LTD would probably be her best option, and that she was running out of time to apply. Pl. Dep., Appx. 00151:12-00153:15. Plaintiff also claims that Ms. Harriss's demeanor changed after she took her FMLA leave, stating that Ms. Harriss "seemed…not as friendly…a little shorter." Pl. Dep. 00255:9-00255:25.

Plaintiff's purported examples of antagonism by Ms. Harriss offer little support for a *prima facie* showing of causation. The only allegation weighing in Plaintiff's favor is her assertion that Ms. Harriss mentioned retirement to her on two occasions.[20] Conversely, Plaintiff's attempt to cast Ms. Harriss's statements about LTD benefits as antagonistic are specious at best. Ms. Harriss was a Nurse Case Manager assigned to manage Plaintiff's short-term disability benefits and FMLA leave. Harriss Dep., Appx. 00308:21-00310:1, 00458:2-00458:7. Plaintiff offers no authority supporting the proposition that a case manager's attempts to inform an employee about their protected leave benefits constitute antagonistic behavior. Likewise, Plaintiff's expressions of gratitude in her communications with Ms. Harriss *after* January 2018 undermine her assertion that

---

[19] The Court must credit Plaintiff's "non-conclusory affidavit[s] or witness[] testimony, when based on personal knowledge and directed at a material issue." *Paladino v. Newsome*, 885 F.3d 203, 209 n.34 (3d Cir. 2018).

[20] While accepting these allegations as true, it is unclear how this evidence, on its face, suggests a pattern of antagonism, especially since Plaintiff herself never indicated that she considered these statements to be unreasonably scrutinous or oppressive. Nevertheless, the Court must construe the evidence in the light most favorable to Plaintiff.

Ms. Harriss was "not as friendly" beginning around that time. *See, e.g.*, Harriss Case Progress Notes, Appx. 01142; Harriss Dep, Appx. 00434:8-00434:23. By way of example, in an email reply sent on March 12, 2018, Plaintiff thanked Ms. Harriss for "keeping her informed about the process" and told her that "[y]ou always seem to know what I'm thinking as I was just wondering about things this weekend…I really appreciate your kindness." Leathers Email to Harriss, Appx. 01040.

Plaintiff also alleges that she did not believe that GSK was doing enough to find her a new position or return her to her current position with an accommodation. Def. Resp. 11. However, GSK personnel ran weekly job searches in an attempt to find a new role for Plaintiff within the company. *See* Carroll Dep., Appx. 00535:20-00535:24. Likewise, GSK regularly updated Plaintiff on their job search efforts. *See, e.g.*, Pl. Dep., Appx. 00137:16-00137:21; Wiand-Stanton Letter to Leathers, Appx. 01046; Carroll Email to Leathers, Appx. 01047; Harriss Case Progress Notes, Appx. 01142.[21] When asked whether she thought HR representative Michele Mulkern, who was assisting with Plaintiff's job search, treated her unfairly, Plaintiff answered, "No." Pl. Dep., Appx. 00169:9:00169:11. Plaintiff herself searched for positions, and confirmed to Gene Carroll that she also had not found any meeting her criteria. *See* Leathers Email to Carroll, Appx. 01051. Finally, when Mr. Carroll identified what he believed to be an equivalent available position[22] in Collegeville, Pennsylvania, Plaintiff declined to apply for it.[23] This evidence tends to belie the notion that GSK did not make a sufficient effort to identify alternative positions for Plaintiff.

---

[21] A note from May 21, 2018 indicates that Plaintiff told Ms. Harriss that "Michele [Mulkern] and Gene [Carroll] have both been in touch to keep me updated" regarding their search for alternative positions.

[22] Mr. Carroll stated that this new position was the same or equivalent to Ms. Leather's BMA role because they both had a level ten job grade. Carroll Dep., Appx. 00579:15-00580:9.

[23] Plaintiff did not apply for the position because she believed that the additional twenty minutes required for the commute to Collegeville was not reasonable. Pl. Dep., Appx. 00126:7-00129:4.

Equally unavailing is Plaintiff's contention that GSK refused to accommodate her need to avoid chemical exposure, thereby evidencing a pattern of antagonism. As a threshold matter, Defendant had no duty to provide Plaintiff with an accommodation under the FMLA. *Macfarlan*, 675 F.3d at 271. Furthermore, Defendant was unable to ascertain what accommodations Plaintiff required because her health care providers never responded to Defendant's inquiries seeking that information. *See supra* Part IV(A). Plaintiff suggests that she could have returned to her job with the assistance of a respiration device. Pl. Resp. 13. However, Plaintiff herself acknowledged that she had never used a respirator before and was not sure if it would have addressed her medical needs. Pl. Dep., Appx. 00105:6-00105:21.

The evidence offered by Plaintiff does not establish a pattern of antagonism or retaliatory animus. In fact, other evidence on the record suggests the opposite. GSK has consistently maintained that Plaintiff was terminated because she had exhausted her FMLA and STD leave. *See* Harriss Dep., Appx. 00460:3-00460:8; Carroll Dep., Appx. 00492:12-00492:17; Mulkern Dep., Appx. 00671:6-00671:9; Bertini Letter to Leathers, Appx. 01041. The Court therefore discerns no inconsistencies in the employer's articulated reasons for termination. Likewise, Plaintiff had taken FMLA leave on two prior occasions without issue.[24] *See* Pl. Dep., Appx. 00110:20-00111:14. This additional evidence adds further weight to Defendant's position, and supports the conclusion that Plaintiff cannot establish a *prima facie* case of causation.

Even if Plaintiff was able to satisfy the first prong of the *McDonnell-Douglas* analysis, Plaintiff would still be unable to establish that GSK's stated reason for termination was pretextual. "To establish pretext, 'the plaintiff must either (i) discredit[] the proffered reasons, either

---

[24] While not itself suggestive of the absence of retaliation, this may serve as a factor in the Court's overall assessment of whether Plaintiff has established a *prima facie* case of causation. *See Williams v. Pinnacle Health Family Care Middletown*, No. 18-00722, 2020 WL 8991688, at *7 (M.D. Pa. Mar. 18, 2020).

circumstantially or directly, or (ii) adduc[e] evidence…that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Wells v. Retinovitreous Associates, Ltd.*, 702 Fed. App'x. 33, 36 (3d Cir. 2017) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). This requires the plaintiff to demonstrate that the employer's proffered reason was "so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). The plaintiff must show "such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (citation omitted).

Prior to her termination, GSK informed Plaintiff that she would no longer be employed by the company if her STD benefits were not extended beyond June 11, 2018. *See* Bertini Letter to Leathers, Appx. 01041. After declining to apply for LTD or alternative positions within the company, Plaintiff was terminated following the expiration of her STD benefits. DSUF ¶ 39. GSK has consistently maintained that the exhaustion of her STD leave was the reason for Plaintiff's termination. *See* Harriss Dep., Appx. 00460:3-00460:8; Carroll Dep., Appx. 00492:12-00492:17; Mulkern Dep., Appx. 00671:6-00671:9. Plaintiff herself confirmed that she was in fact terminated for this reason. Pl. Dep., Appx. 00120:25-00121:10. These facts evidence neither "a *post hoc* fabrication" nor an ulterior motive.[25] *See Fuentes*, 32 F.3d at 764. Therefore, in addition to being unable to establish a *prima facie* showing of causation, Plaintiff cannot establish pretext under the third prong of the *McDonnell-Douglas* framework. Finding no genuine dispute regarding the

---

[25] Plaintiff suggests that Defendant's purported failure to accommodate her medical restriction is suggestive of pretext. This argument is unpersuasive for the same reason as in other portions of Plaintiff's Response, that is, GSK had no duty to accommodate Plaintiff under the FMLA. *Macfarlan*, 675 F.3d at 271.

aforementioned facts, the Court holds that Defendant is entitled to judgment as a matter of law on Plaintiff's discrimination and retaliation claims.

## V.    CONCLUSION

Defendant had no duty to restore Plaintiff to the same or equivalent position under the FMLA.  The undisputed facts show that frequent exposure to, and the handling of, a variety of chemicals was an essential function of Plaintiff's job.  Plaintiff was unable to perform this duty as a result of her medical restriction requiring her to avoid chemical exposure.  Defendant is therefore entitled to judgment as a matter of law on Plaintiff's interference claim.  Furthermore, Plaintiff has failed to establish a *prima facie* case of causation between the assertion of her FMLA rights and her termination.  Plaintiff has likewise offered insufficient evidence to create a genuine factual dispute as to whether GSK's purported reason for her termination was pretextual.  As a result, Defendant is entitled to judgment as a matter of law on Plaintiff's discrimination and retaliation claims as well.  In light of the forgoing, Defendant's Motion for Summary Judgment is granted. An appropriate Order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge